24-1279. Good morning. Good morning. May you please the court. I am Mark John Doe, I represent the plaintiffs and appellants in this matter. You're going to have to speak up just a little bit. Sure. Is this better? Your honors, the district court denied our motion to file a 30-minute complaint in this case because in its view plaintiffs failed to allege the plan's record-keeping fees were excessive relative to the services rendered. The district court's decision can be boiled down to the following points. We, plaintiffs failed to allege the plan's record-keeping fees were excessive relative to the services rendered because, A, we don't plead with specificity that our comparative plans received the same services as the plan. B, we offer no alternative plan that has a comparable number of participants or assets under management as the plan and C, our alleged $25 to $30 reasonable rate is not unreasonable. May I ask you a question? No, I just wanted to weigh out the introduction.  there is also another matter, Sing v. Deloitte, is that correct? That's correct, your honor. You are the attorney in that? That is correct, your honor. And did you also argue before another prior panel? I did, your honor. Can you explain to me what substantively, materially, is different in that case? Because Judge Cotto also is the district court judge in that case and dismissed the case for what appear to be very similar reasons. So if there is some material difference between this case and Sing v. Deloitte, I'd appreciate understanding what the difference is. Of course. Factually, the main difference between this case and that is in that this case the plan record-keeping fees were paid using an asset-based system rather than the per-participant system. That's a big difference because here there's a $3 billion plan and the assets of the plan kept increasing and as it increased the record-keeping fees also increased. Now that addresses... That was part of the argument, as I understand it. Yes, but in terms of differentiating this case from Deloitte, the fact that this was an asset-based system actually addresses a couple of the criticisms that Judge Cotto had. The first is, with regard to services, one can make the argument, and we make the argument, that when you have an asset-based system where the record-keeping fees can increase regardless of whether or not the actual services change, now you actually have an apples-to-apples comparison where you have higher fees for the same services. So in our mind, that's an unreasonable, imprudent way to run a plan where you pay more for the same thing year after year. So that was the main difference between this and the Deloitte case. The other difference is, Your Honor, is that since the Deloitte case was dismissed, there's been other case law that has come into play where other circuit courts, like the Fifth Circuit and the Perkins v. United Surgical case and the Third Circuit and the Mado v. Wesco case, have issued decisions that are in line with the arguments we've been making both in Deloitte and in this case. And the main argument is the pleading standard that you apply in these types of ERISA cases. What Judge Cottle did and other judges who have issued decisions like his, is they've set a higher pleading standard than should be set in the ERISA case where a lot of the information that is not available to plaintiffs, such as record-keeping services agreements from other plans. What the Third Circuit, Fifth Circuit, and Seventh Circuit in the Hughes case have said is that record-keeping fees are fungible, record-keeping services are fungible. In other words, these record-keepers, like the Fidelities of the World and Principles of the World, who were the record-keepers in this case, these are large, sophisticated record-keepers who have for years been doing this business. They've built an infrastructure where they can address any needs available. So the onus becomes, comes onto the plans fiduciaries to negotiate better deals because for the record-keeper, it costs them the same to do whatever you want. So let me ask you about that a little bit. In your complaint, in the third amended complaint, the proposed complaint, where is it alleged that the record-keeping services in this case are fungible in the way that you describe? Of course. And that it doesn't really matter because what it sounds like is a version, a light version of the argument that this is an asset base. That's right. So starting in paragraph 61, Your Honor. What page is that on the record? APP 275. Okay. So in paragraph 61, we state nearly all record-keepers in the marketplace offer the same range of services and can provide the services at very little cost. Then if you jump, essentially, this whole section describes it, but if you go specifically to paragraph 65, again, we say these services are offered by all record-keepers for one price, typically at a per capita price, regardless of the services chosen or utilized by the plan. Then you can also look at paragraph 66 to 67. In paragraph 66, we see the services chosen by a large plan do not affect the amount charged by record-keepers for such basic and fungible services. Yeah, and in paragraph 67, we state the cost of providing record-keeping services often depends on a number of participants in the plan. And so on and so forth. And I'll represent to Your Honors that these are very similar allegations that the successful plaintiffs in the Hughes versus Northwestern case in the Seventh Circuit pled, the plaintiffs in the Mader versus Wesco case in the Third Circuit pled, and the plaintiffs in the Perkins versus United Surgical case pled. And I'm very familiar with the Perkins case because that was also my case, that I appealed before the Fifth Circuit. And like this case, defense counsel in the other case made the same argument that plaintiffs had failed to show that the amount of services provided, that the fees paid for the services provided were inadequate or there were incomparable comparisons. So my time's running out, but the point I want to stress is that these services are fungible, but regardless of that, in this particular case, because of the asset-based way of charging, we can actually effectively address the services argument because you're paying more for the same level of services year after year. And this is, you can see this from our record assets charge that we have in the complaint. I'll yield and take the two minutes from it. So as I understand it, according to the Third Amendment complaint, the range, or at least Judge Kudlow believed that the fees charged included these optional services and that that's somehow not reflected in the $25 to $30 range. Your Honor, the way we address it in our reply brief, we say in looking at the services agreement, some of those options were potential options that there's no indication that the plan actually utilized. And additionally, we would say there's no, you know, here the plan was paying a $45 per participant up to $50, $60 in one year. Our response is even if they were paying for those options, which there's no indication there were, it can't possibly just address the $20 difference in record keeping fees. I appreciate that that was in your reply brief, but where do you allege, where does the Third Amendment complaint allege that these optional services were not as part of the fee rate? In the Third Amendment complaint, what we say is that all the options, including the optional, they're all part of the core services. So if you look at so in paragraph 63, what we allege is a review of the plans record keeping agreements in effect during the class period revealed that principal in 2016 through 2017 and later fidelity were not providing any services beyond the standard services listed above in exchange for the asset-based record keeping fees. So I would boil down to even the optional services offered were within the standard that fidelity and other major record keepers could provide. No, but that's at odds with this, what I think this allegation is saying in 63 is that there were no optional services provided. Well, it doesn't say that specifically. What we're saying is, we don't mention the optional services, but we looked at, we reviewed this. Our complaint is in response to our reviewing the services agreement and coming to the conclusion that no matter what was on there, it was still part of the standard services that was offered. And these are issues which should actually be argued on, these are factual issues that should be argued. The point is, I should be trying to get a summary judgment, I understand that, okay. Well, yeah, I think that's a lot of the third, seventh circuit. These are factual disputes that need to be dealt, need to be addressed through discovery and when the plaintiffs have a chance to. Yeah, yeah, I'll address it. So you, you have reserved two minutes for rebuttal? Yes. All right, so we'll hear from you after hearing from your family on the other side. Thank you, Your Honor. May it please the court. My name is Michael Kimberly. I represent the Eppolese in this case. Your Honor, if I may, I'll start first with Singh since Judge Loya, you raised that. I think if the court affirms in Singh, it's got to affirm here as well. But if it reverses in Singh, it doesn't follow that it's got to reverse here as well. The principal distinction being that in this case, there are straightforward contradictions in the allegations here that are not present in Singh. And that's, that's really... All to say, Your Honor, I think the district court got it right, absolutely. Now, plaintiff's theory of this case in both the third amendment complaint, the second amendment complaint, and the opening brief, is that having chosen an asset-based fee model, which is a fee model that depends on the assets under management rather than a per capita flat fee, that having chosen this model, Montefiore had a duty to monitor the fees as they fluctuated with the amount that was under management, and to negotiate them downward when they got too high. They then hypothesized that the record-keeping fees are essentially the same no matter what, and this is what my friend on the other side was just discussing, no matter what services are selected, and that no plan pays more for any differences among the different services that record-keepers pay. They allege also that as plans increase in size, they can get lower fees. So as a plan is increasing, it should be getting, in size, it should be getting lower fees. And applying all of that here, those, those theories here, they say that my clients are liable because they failed to conduct RFPs or otherwise take quote-unquote proactive measures to negotiate downward the record-keeping fees at issue here, and that the record-keeping fees that were paid were outrageous and astronomical. The problem is that every single one of those allegations is contradicted by the complaint itself. So take first the allegation that the plan didn't monitor or renegotiate fees. Take a look at paragraph 95 on, this is page 286 of the appendix. This is the third amended complaint. This is an allegation consistent with the second amended complaint. This is the chart, with the chart? This is the chart, your honor, and what it shows is between 2017 and 2018 the plan renegotiated fees. And in fact, what the allegation is, not only did they renegotiate fees, they changed record-keeper and switched to fidelity. Fees went down as a result. The same chart shows between 2021 and 2022. Montefiore renegotiated again. Fees went down once more. What it shows is that as plan assets were increasing, under an asset-based fee model, the record-keeping fees also were increasing, and when they got too high, the plan was monitoring and it renegotiated. And what the 10th circuit said in Matney against Barrett Gold, is that the duty here, remember the duty is not tied to the amount that's being paid. The duty is to monitor and to take prudent action to control fees on behalf of the plan. Right, but the predecessor duty or the corollary duty, you're focused on the duty to monitor. There's the other duty that was the focus of Judge Codall's opinion, the duty of prudence, right? So that, and that, I understand it, as I understand it, relates to whether the range in the first place is an excessive one or a reasonable one. Right. And what I think you're getting at with the duty to monitor is that let's say it's excessive and the the record-keeper figures that out and reduces it by some amount that's still in excess of what would be reasonable. Sure. That's still a potential violation of the duty of prudence. So, do I have that wrong or right? Well, I think what the potential violation of the duty of prudence would be a failure to negotiate a reasonable fee under the circumstances. This case can't turn on the failure to negotiate at all. Negotiations took place. We know that. So let me get then to other contradictions in the complaint. The allegation that the plan paid astronomical or outrageous record-keeper fees. This is a position that my friends on the other side took when they were litigating this case against the backdrop of a simple arithmetic error. Their view was that record-keeping fees had ranged between $150 and $170 per person under the Second Amendment complaint. We pointed out in our motion to dismiss that they did their math wrong and that doing the math correctly shows that the range is actually in the $30 to $60 range. So that didn't dissuade them. They came back and continued to insist that although these fees were actually about a third of what they had originally alleged, they still were astronomical and outrageous. But that is contradicted once again, and it's contradicted in three different ways. First, the comparators themselves that they offer. Second, paragraph 108 of the Second Amendment complaint, which today remains the operative complaint. And the third are the planned documents that are referenced and therefore incorporated by paragraph 63 of the Third Amendment complaint that my friend on the other side was just discussing. So take first the fees that were paid. The range that is alleged even in the Third Amendment complaint is $25 to $30. In the Second Amendment complaint, there had been a plan that was included as a supposed comparator where the allegation was the fee was $25. But there again, there was another basic arithmetic error because they didn't read the forms correctly. And when you read them correctly, the fee paid for that comparator is actually $45. So what did my friends on the other side do? They just took it out of the complaint. They didn't allege that the facts had changed. They didn't allege that they'd done an investigation. It was no longer appropriate to include it. They just took it out because it wasn't consistent any longer with their theory. Which comparator was that that you were calling? That was Sofani and this is-  Yes, Sanofi, and this is paragraph 100, sorry, that's the wrong one. This is paragraph 105 on appendix 145. So take then also paragraph 108 of the Second Amendment complaint. That paragraph alleged that the median asset-based fee paid in 2018 was .04%. Well, again, if you look at the allegations in the Third Amendment complaint, for all but the first two years of the class period, the fee that was paid by my clients was below that median, below the median. Meaning that more plans in the market, according to paragraph 108 on appendix page 148, that more plans paid more than paid less in 2018 than my clients paid during a majority of the class period. And then finally, take docket 62-2. This is the agreement with Fidelity that my friend says indicates that we didn't pay extra for any additional services. In fact, it shows the exact opposite. This is a document under seal, so it's not in the appendix, but it's in the district court's record, 62-2. And what it shows at page 15 is that changes in the services provided will change the fees paid. That's in the final paragraph under your role and responsibilities. You then look to page 22 of that document, 22, I'm looking at the header now, 22 of 46. And under the heading optional services, it says additional elections may need to be made and additional fees may apply, so optional services are adding fees. Then you turn to page 24, which shows among the very many other additional optional services that were clearly selected here, includes one-on-one retirement planning assistance provided on the work site. That is, I mean, we all know from personal experience, that is not something that every plan provides. And then you look to page 28 of that document, which concerns fees. And it says that the minimum annual fee shall be the share, which at that time was .073% of contract assets. And then it says below the third bullet, next to the check mark, that there are no bill deducted or netted charges for plan expenses unless otherwise noted in the optional services fee table, which is to say that .073 covers everything, including all of the optional services, unless otherwise noted. And then there are no otherwise noted additional fees. Let me just ask you a more general question. Your friend on the other side alluded to these three other circuits, at least, that seem to be a little bit more sympathetic to these ERISA types of claims. I'll just put it that way. And part of the premise of at least a few of those decisions, as I understand it, is that reasonableness and prudence, or imprudence, of compensation under these ERISA plans is usually a fact question. Usually a question of fact. I mean, you're going through, and I think what you're arguing is that the contradictions, either between the allegations in the second amended complaint and the proposed third amended complaint, or the contradictions within the third amended complaint itself, tell us all that we need to know. But usually, am I right, these reasonableness or prudence issues are questions of fact. Not in this case, Your Honor. And if I may, I'll... So this is the unique case. No, no. No, no. Well, I mean, I do think this is a unique case in some respects because it contains so many contradictions. We don't usually see that. But I would point the court to the Barrett decision out of the Eighth Circuit. I think this is a good example. This is 112F4-1135. And the key analysis is at page 1139. What that case holds is if you're coming to court alleging that the trustees could have gotten a lower price, you've got to show comparators. But the comparators have to be apples to apples comparators. And so what it means is you have to allege, plausibly, that the other plans that you say were getting lower fees were getting the same services. My friend's response to this is his paragraph 65 and 66 in which he says, don't worry about differences. Nobody pays anything different for different services. Right? That's his theory. The differences don't matter. Everybody pays the same amount. But my point with this document 62-2 is it... and it's incorporated into his complaint. It belies that allegation. It shows very clearly that Fidelity is charging additional amounts for the additional services that my client elected to select for its plan participants. I would add just one final thought, Your Honor, because I know I'm over time. To take my friend's logic to its rational conclusion is to say that asset-based fee models are per se imprudent. And because he says, well, assets go up over time, so necessarily you will be paying more without getting more. But that's wrong. The Department of Labor has issued a bulletin on this. It's cited in our brief. It's 2003-03. And what it rightly holds is that there are reasons that a fiduciary might choose this sort of model that have... that are not directly related to how much it costs. And it's treating different classes differently. You want participants who are new to the plan, who don't have a lot saved, you want to encourage them to save. So shifting these fees to others is a reasonable, prudent decision even if it doesn't... Speaking of prudence, let me just go back to Singh. Yeah, sure. Isn't that a case where we should maybe hold? I understand that you think you win no matter what. We should hold and see what that prior panel decides? I think it would be perfectly appropriate, Your Honor, to wait for a decision in that case. And like I say, if that case is affirmed, I think the court should... I'll ask you the same questions. I think maybe you answered in part. Are there any material differences? Yeah. Well, I think the fact that this is an asset-based versus a flat fee-based is a material difference. But again, I mean, our theory of this appeal and the decision below is that essentially the plaintiffs in this case have pled them out of court for case-specific reasons that are tied again to the course of this litigation, the fact that they made arithmetic errors, and rather than sort of folding chop and recognizing they'd made a mistake, they're sort of sticking to it. And they've included, as a consequence, so many contradictions in the complaint that it's got to be dismissed either way. Thank you very much, Mr. Gannon. Thank you, Your Honors. I'll be very brief. My friend actually made some points that sort of bring home the global point that these issues can't be resolved at the... These are very factually intensive cases. Point being, the first point my friend made was that there's no evidence that the plaintiff fiduciaries here negotiated the rates for the record-keeping fees. And he does this by looking at each year where the asset-based fee is reduced. I will represent there's nothing in the records that show that those actual negotiations that went on. And we don't know whether it was the plaintiff fiduciaries actually negotiating or it was the record-keeper who had a schedule where it reduced it. And the reason we don't know this is because we don't have meeting minutes which would indicate what the plaintiff fiduciaries were thinking. These are meeting minutes that we, although... Are you aware of a situation where the rates are voluntarily reduced without any negotiation? Absolutely. Yes, I am. I've done many of these cases. Fidelity once in a while does, they have schedules where they do reduce it. But we don't know if that was the case here or it was a different case. That's another reason why these are factual disputes. With regard to the point about the other options, I mentioned in my opening, but the fact is the additional options that may be selected, that may have been elected here, we baked into the pricing, but we say because these services are fungible, even the options could have been offered for the same price as the other funds. And when you say fungible, Mr. Kimberly, I think he disputed that. He said they're not quite fungible. These are actual services that I pay for and that I get, and they're extra services. It's fungible in the sense that it's a product that's already there, that it doesn't cost the record keepers anymore to provide to you or not provide to you and it's incumbent on the fiduciary. Is part of the plan, the plan document says you got to pay more for these optional services. Is that right? Yeah, yeah, the services agreement. How is that fungible? But it doesn't even say how much they cost. It says it's all baked into the same price, asset-based price. That's actually evidence that that's fungible. They don't break it out. It's the same, it's the one price for everything, whether you include the fungible things or not. So, and lastly, the, I do, if the court were to hold off until a sing was decided, although I've explained that there's material difference between this case and that case, all I would ask is for additional briefing to, depending on how, whatever, whichever way it goes, in order to supplement this record. And I'm sorry, one more question. Mr. Kimberley mentioned this 8th Circuit case. I think it's the Tussey, Tussey case. O'Reilly, Barrett versus O'Reilly. Okay, another one, okay. Yes, so Barrett versus O'Reilly, that was, at full disclosure, that was also my case. But it was played differently than these other cases. And the issue with Barrett versus O'Reilly was the comparators, where the court thought we didn't have meaningful comparators. Well, whether or not that was accurate in Barrett, that's been addressed in this case. Because what we've done here is we've compared this plan to other plans where fidelity was the record keeper, and other plans where the amount of participants were similar in size to this plan. So that the demographics are fairly similar. And if you take that in context with the fact that we argue, and other courts have said that these services are pretty much fungible, then it really comes down to the number of participants in the plan. You, but you, you ultimately may agree that understanding that there's a difference in the structure of that issue here, asset basis.  That the panel in St. May say some things by way of a holding that might shed light on the issues here. Yeah, sorry, this panel or the Deloitte panel? Yeah, yeah, I mean, certainly because the core arguments are the same with regard to the pleading standard, so yes, I do think it could shed some light. Thank you very much. Thank you. We'll reserve the decision.